[Civ. No. 14631.   Second Dist., Div. Three.   June 29, 1945.]

CHARLES M. JACKSON et al., Respondents, v. FRANK T. HARDY et al., Appellants.

Dudley Robinson for Appellants.

Bauder, Veatch & W. I. Gilbert and Donn B. Downen, Jr. for Respondents.

DESMOND, P. J.—Defendants, Hardy and Law, owners of livestock in the neighborhood of Mojave, appeal from a judgment by which the court assessed damages against them under the first cause of the complaint in the sum of $723.67 for injuries resulting from a collision upon a public highway at 10:30 p. m. of August 21, 1942, between the Jackson automobile and a cow belonging to defendant Hardy, and under the second cause, damages in the sum of $1,303.47 resulting from a collision between a bull belonging to defendant Hardy and a passenger bus belonging to M. C. Yahne, Incorporated, doing business as Inland Stages. This second collision occurred on the same night and on the same highway as the first and about an hour and a half later. Prior to the filing of the complaint the bus owner assigned its claim to the plaintiffs.

The first collision occurred on a much-traveled state high-

way at a point approximately one and one-half miles south of the city of Mojave while Mr. Jackson was driving his family north from Los Angeles toward Lake Tahoe. The weather was clear and the road where the accident occurred was straight, but it curved about a fifth of a mile north of the point of collision as it entered Mojave. Jackson testified that just before the accident a car was coming toward him about a quarter of a mile away and another car was about 200 feet behind him; that he first saw the cow when she was about 60 or 70 feet in front of him, in the middle of his lane of the road; that he was traveling about 40 miles per hour at the time; "my daughter hollered and at the same instant I saw this—— I saw eyes staring me in the face and that is the first thing I noticed. The next second why a cow loomed up and I slapped on my brakes. . . . Q. And at the time you saw the cow, how close would you say this car was to you that was coming from the opposite direction? A. Oh, that was practically about the same time because I done no more than—— I was watching the fellow's headlights and I had mine on the beam, the low beam, because, as I say, there was a lot of traffic that night and I had passed several cars and when this car headed up to me I just left it on the low beam because he was about a quarter of a mile from me and I saw these eyes and hit the cow''; that after hitting the cow his car came to rest on the paved portion of the road not more than ten feet from the point of impact; that the cow was "very black" in color. When asked why he had not swerved his car to avoid hitting the cow, Jackson answered that he probably could have if it had not happened in "such a split second."

As a result of the collision, Mrs. Jackson, asleep in the rear of the car, was thrown out, sustaining the personal injuries complained of and the Jackson car was damaged.

The second collision, involving the passenger bus, occurred about half a mile south of the scene of the Jackson collision. The bus, containing 12 passengers and driven by P. G. Higgins, was heading north toward Mojave. It was traveling, according to the testimony of the driver, at about a speed of "Under 33 miles an hour," and in third gear, the next to the highest gear. He stated: "There was a pair of lights that came around the curve of a highway which for an instance [sic] blinded me. Then, just as the glare of those lights got past, here stands a bull in the middle of the road, and by that time

the car got down to me where I couldn't swing over to the left side of the road to avoid hitting him and a ditch being on the right, I couldn't swing there, consequently I hit the bull''; that when he first observed the bull it ''wasn't over 20 feet'' away from him; that the bull was a Hereford, dark red and white in color; that the highway where the accident occurred was a two lane highway ''with just a couple or three feet on each side to spare''; that the lights of the car headed toward him were very bright; that he blinked his lights several times for the driver of the other car to dim his but the latter did so only after it was too late, for he had already observed the bull in the road; that he immediately applied his brakes but after he saw that he was going to hit the animal he accelerated his speed to prevent it from getting underneath his wheels and turning the bus over; that ''I hit my brakes and my brakes took hold and I seen [sic] that I was going to hit; I couldn't swing to the left; if I had I would have come head on with this other car coming toward me so I just gripped my wheel and let go of my brake and stepped on it,'' knocking the bull off the road to the east side; that the bus was equipped with air brakes; that they were more dependable than any other type.

Leon Smith, a witness for plaintiffs, stated that he had been hired by Hardy to help defendant Law (Hardy's father-in-law) drive his cattle, which were commingled in a common herd with those of defendant Law's, from the place where the cattle were then grazing, some 11 miles east of Mojave, to Duntley Spring, about 12 miles west of Mojave; that he had been instructed by Hardy to take orders from Law; that there were about 210 or 215 head of cattle in the herd, of which 110 or 115 belonged to Hardy and the rest to Law; that on August 19th, 1942, Law brought his horse in a horse truck from Little Rock where he lived, a distance of about 40 miles from Mojave, to Smith's place where the cattle were grazing, and he and Law saddled their horses and started to round up the cattle and herd them toward Duntley Spring; that they drove them to a point about three or four miles west of Mojave; that it took them from about 10 o'clock in the morning until about 6:30 that evening; that the cattle then started to bed down and Law said, ''Well, we will just leave the cattle here and I will come back in the morning''; that Law asked him if he could come back and he answered, ''No, I have got to work''; that he had taken off only one day from the Mojave Mud Cor-

poration, where he was employed, in order to help drive the cattle. When asked whether he had any conversation with Law concerning whether the cattle would stay there, he answered, ''Well, I told him that I didn't think the cattle would stay up there; when daylight come somebody would have to be there and drive them back, and he said, 'Well, I will come up in the morning and get them on out' and that was all that was said; we loaded the horses and went home. Q. Did you indicate to him where the cattle might go if they did stray? A. Well, I said something about coming back, they might come back the other way, and we would have to drive them over again. Q. What did you base that opinion upon? What was the reason for you thinking that they would return? A. I thought maybe they would drift back; they generally always do. A cow will drift back from one water hole to another. Q. In other words they will drift back to where they had been watered previously. A. Yes.'' Smith further testified that he and Law went back to his place where the horses, including the one brought by Law, were placed in a corral; that Law did not come for his horse the next day nor the day following, which was August 21st, the date of the accidents; that he, Smith, was informed of the accidents about 1 o'clock a. m. of August 22nd when the road patrolman and the bus driver drove in the yard and asked ''if I were taking care of the cattle . . . . I said 'No, they are out of my jurisdiction, I haven't anything to do with the cattle at all.' . . . Well, Clark [the road patrolman] asked me to go down and drive those cattle back off the road and I said: 'All right.' There was a friend of mine with me and I didn't want to saddle up a horse and ride all night, working, and he told me to get his car and we would go down in the car and we went and drove back those that was across the railroad track and drove them back across into the other pasture where they were at . . . west of the highway''; that when he arrived there were about 75 head of cattle along the railroad right of way. This witness, when asked the question ''. . . Do you, yourself, know of any person who was actually in charge of the cattle from the time you left them on the night of August 19th, to the time of the accident?'' answered, ''No, I don't.''

In considering the grounds urged for reversal, it is necessary to quote at this point the following portion of section 423 of the Agricultural Code of California, ''No person owning, or controlling the possession of, any live stock, shall wilfully or negligently permit any such live stock to stray upon or

remain unaccompanied by a person in charge or control thereof upon a public highway, both sides of which are adjoined by property which is separated from such highway by a fence, wall, hedge, sidewalk, curb, lawn or building. . . .''

What may be called the charging allegations of the complaint as to each cause of action are identical and read as follows: *"that at said time and place the defendants, and each of them, did negligently and carelessly permit certain cattle then and there owned by said defendants to stray upon the said highway,* and to remain thereon unaccompanied by any person, and without providing a sufficient or any number of herders for such cattle, in violation of Section 423 of the Agricultural Code of the State of California, then and there in full force and effect; that by reason of such negligence on the part of the defendants, and each of them," etc. (Italics added.)

The trial court in awarding damages for each collision found as follows: ''That at said time and place the defendants, and each of them, did negligently and carelessly permit certain cattle then and there owned by said defendants to stray upon the said highway, and to remain thereon unaccompanied by any person, and without providing a sufficient or any number of herders for such cattle *and* in violation of Section 423 of the Agriculture [sic] Code of the State of California, then and there in full force and effect; that by reason of such negligence on the part of the defendants, and each of them," etc.

The judge, in making his findings, merely added to his quotation from the complaint the conjunction ''and,'' as we have indicated by italics, and the addition of that single word directs us to the main point of this appeal. It is contended by appellants that the court was without power under the pleadings to find that the defendants negligently permitted their cattle to stray upon the highway, *and* also that such straying, so negligently permitted, constituted a violation of section 423. They assert that the first finding is on an issue of general negligence not alleged in the complaint, and argue that the case was tried on an issue of specific negligence only, namely, the violation of the provisions of section 423. They say that, following the allegations of the complaint, they defended only against that particular type of negligence. As to the finding on the issue so raised they argue that the evidence failed to show that they had permitted their cattle to stray or remain upon a public highway, fenced, or otherwise bounded,

on both sides as described in section 423, and that they should be acquitted of all blame since that was the only kind of negligence charged against them in the complaint.

We note that defendants, answering both causes of action, had denied that they "did negligently and carelessly, or negligently or carelessly, permit certain cattle then and there owned by said defendants, or either of them, or any cattle at all, *to stray upon the said highway,* or upon any highway, and/or to remain thereon unaccompanied by any person and/or without providing a sufficient or any number of herders for such cattle, in violation of Section 423 of the Agricultural Code of the State of California, or in violation of any section of any code, or of any law, of the State of California, *or at all;* and deny, and each of them denies, that by reason of such *or any negligence* on the part of these defendants, or either of them, the vehicle then and there owned by the plaintiff . . . collided with certain cattle [etc.]." (Italics added.) Also, as one affirmative defense, appellants alleged as to each cause of action that all damages resulted from an unavoidable accident so far as they were concerned "and occurred without any negligence on the part of these defendants, or either of them."

■ Answering appellants' contention that general negligence was not charged in the complaint, we point out that under our system of pleading, it is unnecessary to plead or refer to a statute relied upon as creating a duty, where the action is one predicated upon the negligence of the defendant and not one to enforce a liability or penalty imposed by statute (4 Bancroft's Code Pleading, p. 3538; *Martin* v. *Shea* (1920), 182 Cal. 130, 136-7 [187 P. 23].) ■ Therefore, the phrase in the allegation reading "in violation of Section 423 of the Agricultural Code of the State of California, then and there in full force and effect; . . ." is unnecessary, being surplusage and redundant. (See *Szopieray* v. *West Berkeley etc. Co.* (1924), 194 Cal. 106, 113 [227 P. 720]; *Opitz* v. *Schenck* (1918), 178 Cal. 636 [174 P. 40].) In the Opitz case defendant appealed from a judgment in favor of plaintiff in an action to recover damages for personal injuries. The complaint alleged negligence generally, and further alleged that defendant, in driving his automobile "cut the corner" at the intersection of the streets "in violation of an ordinance of the city of Los Angeles prohibiting it." On appeal, it was claimed that the ordinance was improperly

pleaded. This argument the Supreme Court disposed of in language singularly appropriate to the case which we are considering (p. 638): "The complaint, however, was good without any allegations as to the ordinance at all. It alleged negligence in general terms which, as we have just shown, was all that was necessary. If under such an allegation the plaintiff wished to prove the violation of the ordinance, he could do so whether it was pleaded or not. This was not an action for damages for the violation of a city ordinance, or to enforce a liability or penalty imposed by one where, of course, it would be necessary to plead the ordinance relied on as the foundation of the action, but was an ordinary suit for damages for negligence pleaded in general terms. Under these circumstances the defective pleading of an ordinance relied on as additional evidence in proof of negligence, or a failure to allege its existence at the time of the accident, or at all, is immaterial; its existence and its violation are given in evidence in aid of the general negligence alleged; it is simply evidentiary matter, and as such, under our system of pleading, it would be improper to plead it. (*Cragg* v. *Los Angeles Trust Co.*, 154 Cal. 663 [16 Ann.Cas. 1061, 98 P. 1063].)"

That portion of the plaintiffs' allegation, which we have italicized, *supra*, alleges negligence in general terms on the part of the defendants. The fact that there follows an enumeration of specific acts in the same allegation, to wit, (a) "and to remain thereon, unaccompanied by any person," and (b) "and without providing a sufficient or any number of herders for such cattle," does not alter the character of the allegation in this case, for both of these specific acts, as well as the applicability of section 423, may properly be classed as evidentiary facts, provable under an allegation of general negligence. Since evidentiary averments are superfluous, they may be disregarded. We note at this point the statement in *Olcese* v. *Hardy* (1919), 40 Cal.App. 323, 331 [180 P. 666], "Where general allegations of negligence are followed by an enumeration of specific facts, the plaintiff will not be limited to proof of specific acts unless the complaint clearly indicates the intention of the pleader to limit the negligence to such acts. [Citing cases.]" Defendants were fully advised by the allegations of the complaint in the case at bar that their negligence in permitting their cattle to stray upon the highway was involved in this case. That they so understood the issue presented by the complaint is indicated by the denials in their answer and the allegations in their affirmative defenses.

That the judgment can rest solely upon the proof offered in support of the general allegation of negligence appears from the decision in *Galeppi Bros., Inc.* v. *Bartlett* (1941), 120 F.2d 208. That was a case involving a collision between an automobile and a cow on a California highway. The cattle owners argued that since the accident occurred on an unfenced highway they were under no duty to keep their cattle off the highway because the common law made no such requirement, that such law had not been changed in California and until changed by the Legislature no duty could be found. To that argument the court replied (p. 210) : ''The common-law rule was adopted when there was no elaborate system of highways and no motor vehicles. There was then no such reason for imposing on cattle owners a duty of using ordinary care in the care and control of cattle. Now, however, the changed conditions compel adoption of a different rule. There is no reason for excepting cattle owners from the same duty applicable to other people to use 'ordinary care or skill in the management of [their] property.' Civil Code sec. 1714. . . .'' It clearly appears from this decision that a cattle owner who negligently fails to keep his cattle from straying upon a highway may be held liable in a civil action for damages arising from a collision with his livestock, even at a point where the highway is unfenced, in open range country.

Appellants contend that there was no conflict in the evidence from which a construction might have been taken that the adjoining property was separated from the highway on both sides by a fence, or other means within the terms of section 423, but we take a contrary view. We do so upon reading the record and having in mind that this is a civil case, although violation of section 423 may be prosecuted as a misdemeanor. We rely upon the liberal construction allowable in a civil action when determining what is a fence; that is, whether it must be wholly complete or intact, or whether it may still be a fence when its course is occasionally interrupted by gaps or openings large or small; or whether a railroad track may be considered a curb ; or whether a fence, not immediately adjacent to the highway but separated from it by a railroad right of way, is such ''a fence'' within the meaning of the statute. Notwithstanding the evidentiary conflict, the record shows that there was sufficient evidence before the trial court to indicate that the requirements of section 423 of the Agricultural Code as to fencing had been met, thus supporting

the trial court's finding that defendants had negligently permitted their cattle to stray upon the highway "in violation of section 423 of the Agricultural Code."

As a final contention appellants urge that the evidence does not show a direct causal connection between the alleged negligence and the injuries sustained. It is true that section 423 of the Agricultural Code abolishes the applicability of the doctrine of res ipsa loquitur to a case such as is presented on this appeal (*Anderson* v. *I. M. Jameson Corp.* (1936), 7 Cal. 2d 60 [59 P.2d 962] ; *Galeppi Bros., Inc.* v. *Bartlett, supra*), but it cannot be said, as defendants claim, that plaintiffs here relied upon that doctrine to establish their case, for the evidence goes far beyond the mere showing that the cattle were present on the highway. There was evidence before the trial court showing the circumstances under which they had been driven three or four miles west of the highway on which the accidents occurred ; that Smith had warned Law that the cattle would not stay where they had bedded down ; that Law did not return the next morning although he had indicated to Smith that he would do so, nor did he return to Smith's place for his horse, which he had gone to the trouble of bringing 40 miles at the time of the roundup ; that no one was actually in charge of the cattle from August 19th to the date of the accident. From this and other direct evidence, it could reasonably have been inferred, particularly in view of the testimony showing the propensity of cattle to return to their last waterhole, that the two animals involved in this case had strayed from the herd and were headed toward their old grazing ground ; likewise, that since the two animals, admittedly the property of defendant Hardy, had strayed on to the highway, the 75 cattle found at and near the scene of the accidents were part of the same common herd from which the two straying cattle had come ; also, since Law did not return to his horse, that neither he nor any one else was in charge of the herd from the evening of August 19, 1942, to the time of the accidents, two days later. In connecting defendants' negligence to the injury, it is not necessary that an eyewitness be produced to testify directly to any fact, circumstantial evidence being sufficient. (*Johnson* v. *Griffith* (1941), 19 Cal.2d 176, 179-180 [120 P.2d 6], quoting with approval language used in *Gorman* v. *County of Sacramento* (1928), 92 Cal.App. 656, 661 [268 P. 1083].) The question of defendants' negli-

gence was a question of fact for the trial court and, in our opinion, the evidence presented, together with the inferences reasonably deducible therefrom, supports the trial court's findings and judgment.

Judgment affirmed.

Shinn, J., and Wood (Parker), J., concurred.